[No. H013078. Sixth Dist. Feb. 15, 1995.]

CITY OF SAN JOSE, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
TERRY L. THOMPSON et al., Real Parties in Interest.

**COUNSEL**

Joan R. Gallo, City Attorney, George Rios, Asistant City Attorney, Glenn D. Schwarzbach and Renee Gurza, Deputy City Attorneys, for Petitioner.

Catherine I. Hanson and Alice P. Mead as Amici Curiae on behalf of Petitioner.

No Appearance for Respondent.

Michael Millen for Real Parties in Interest.

## OPINION

**WUNDERLICH, J.**—The respondent superior court has declared unconstitutional, under the First Amendment, a San Jose city ordinance which outlaws targeted picketing within 300 feet of a targeted residence. The City of San Jose seeks expedited review of this decision by writ of mandate. Although the ordinance does not apply specifically to anti-abortion protesters, the present controversy arose when real parties in interest were charged with anti-abortion picketing within the proscribed distance of the homes of staff members of a clinic where abortions are performed.

### Procedural History of the Case

The City of San Jose (City), petitioner, charged defendants, the real parties in interest, in the municipal court, with misdemeanor violations of an ordinance of the City Municipal Code section 10.09.010, which prohibits any person from engaging in picketing activity that is "targeted at and is within three hundred (300) feet of a residential dwelling."

Defendants demurred on the ground the ordinance is unconstitutional. After the municipal court overruled the demurrers, defendants petitioned the superior court for extraordinary review. The superior court issued a writ of mandate directing the municipal court to sustain defendants' demurrers.

The superior court determined that the ordinance was content neutral and not vague, and that it left "open, ample, and alternative channels of communication." However, in the same statement of decision the court found that under compulsion of the decision of the United States Supreme Court in *Madsen* v. *Women's Health Center, Inc.* (1994) __ U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], the 300-foot buffer zone mandated by the ordinance was unconstitutionally broad.

City seeks review in this court by writ of mandate or prohibition, asserting that it has no other effective remedy since it wishes to immediately enforce its ordinance.

City has no routine appellate remedy in this court. Normally it would have an appeal to the superior court from a municipal court order dismissing or terminating an action before jeopardy, or giving judgment for the defendant upon the sustaining of a demurrer. (Pen. Code, § 1466, subd. (a)(1)(B), (C).) However here the superior court has already declared that such a demurrer must be sustained, has indeed mandated that result by writ. Therefore there is no further appellate remedy.

Routine appeals to this court are not generally available in misdemeanor prosecutions. However, this case implicates the validity of a public law. Also, current debate regarding what restrictions may appropriately be imposed upon residential protesters and picketers has generated much controversy and many legal challenges. We believe this case is a matter of sufficient public importance to be entitled to review in this court, which can only be accomplished by writ.

*Discussion*

■ We hold that *Madsen*, which involved application of First Amendment principles to an *injunction*, does not control this case, which involves application of First Amendment principles to a *public law*.

In *Madsen*, a Florida state court permanently enjoined anti-abortion protesters from blocking or interfering with public access to an abortion clinic, and from physically abusing persons entering or leaving the clinic. Despite the injunction, however, the protesters continued to impede access to the clinic. As a consequence, the clinic operators sought and obtained an expanded injunction which, inter alia, excluded demonstrators from a 36-foot buffer zone around the clinic entrances, restricted excessive noisemaking within earshot of the clinic, prohibited protesters from approaching patients unwilling to talk within 300 feet of the clinic, and created a 300-foot buffer zone around the residences of clinic staff.

The court found that the 36-foot buffer zone around the clinic entrance and the noise restrictions were valid. On the other hand, it held that the 300-foot no approach zone around the clinic was more burdensome than necessary to accomplish the government goal of preventing intimidation and ensuring access to the clinic. Likewise, it found that the 300-foot buffer zone around the residences of clinic staff was too broad. The court noted that on the record before it, it appeared "that a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result." (__ U.S. at p. __ [129 L.Ed.2d at p. 614, 114 S.Ct. at p. 2530].)

The court emphasized, however, that "[i]f this were a content-neutral, generally applicable statute, instead of an injunctive order," a different and less "stringent application of general First Amendment principles" would apply. (__ U.S. at p. __ [129 L.Ed.2d at p. 607, 114 S.Ct. at p. 2524].) "Ordinances," the court explained, "represent a legislative choice regarding the promotion of particular societal interests. Injunctions, by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree. . . . [¶] Accordingly, when evaluating a content-neutral injunction, we think that our standard time, place, and manner analysis [such as is used in the case of an ordinance] is not sufficiently rigorous. We must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." (__ U.S. at p. __ [129 L.Ed.2d at pp. 607-608, 114 S.Ct. at pp. 2524-2525].) Applying this "more stringent" (__ U.S. at p. __ [129 L.Ed.2d at p. 607, 114 S.Ct. at p. 2524]) standard, the court found that the 300-foot buffer zone around the staff residences swept more broadly than was necessary to protect the tranquillity and privacy of the home.

According to *Madsen*, the standard to assess the constitutionality of a content-neutral ordinance is that set forth in *Ward* v. *Rock Against Racism* (1989) 491 U.S. 781 [105 L.Ed.2d 661, 109 S.Ct. 2746] and similar cases, namely, whether the time, place, and manner regulations are " 'narrowly tailored to serve a significant governmental interest.' " (__ U.S. at p. __ [129 L.Ed.2d at p. 607, 114 S.Ct. at p. 2524], quoting from *Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 791 [105 L.Ed.2d at p. 675].)

As the trial court correctly found, the ordinance before us is content neutral since it applies to all picketers and not just to those who oppose abortion. (See, e.g., *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 771 [48 L.Ed.2d 346, 363-364, 96 S.Ct. 1817]; *Kaplan* v. *Prolife Action League* (1993) 111 N.C.App. 1 [431 S.E.2d 828, 843]; *Dayton Women's Health Ctr.* v. *Enix* (1991) 68 Ohio App.3d 579 [589 N.E.2d 121, 127].)

The trial court also found that the ordinance leaves open alternative channels of communication. This finding is likewise correct. The issue arose on a demurrer, which raises no factual issues, only issues of law such as facial invalidity of the ordinance. Real parties did not demonstrate that as a matter of law they had no alternative channels of communication. They made no undisputed showing that targeted picketing is the only way for real parties to communicate their message of anti-abortion sentiments to a general public.

Accordingly the ordinance, being both content neutral and not a complete ban on real parties' rights of expression, is plainly valid unless it does not

constitute a reasonable time, place and manner regulation as defined by the foregoing cases.

The seminal case regarding targeted residential picketing is *Frisby* v. *Schultz* (1988) 487 U.S. 474 [101 L.Ed.2d 420, 108 S.Ct. 2495]. That case, like this one, involved an ordinance. The ordinance, for the declared purpose of protecting residential privacy, made it unlawful for persons to engage in picketing before or about the residence or dwelling of any individual. (*Id.* at p. 477 [101 L.Ed.2d at pp. 426-427].) The court construed the ordinance as applying only to "targeted" picketing, that is, picketing specifically directed at the occupants of the picketed homes, and found it constitutionally valid as such. (*Id.* at p. 483 [101 L.Ed.2d at pp. 430-431].)

Since the ordinance in *Frisby*, as here, was content neutral but applied in a public forum, the court applied the standard of constitutionality stated above, whether the ordinance was narrowly tailored to serve a significant governmental interest and whether it left open ample alternative channels of communication. (487 U.S. at p. 482 [101 L.Ed.2d at p. 430].)

The court found the ordinance was intended to protect an important privacy interest, that of residential privacy, which includes protection of the unwilling listener in his home. (487 U.S. at p. 484 [101 L.Ed.2d at p. 432].) "There simply is no right to force speech into the home of an unwilling listener." (*Id.* at p. 485 [101 L.Ed.2d at p. 432].) Pointing out the especially offensive nature of targeted picketing, the court said that such picketing "is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas. . . . Here in contrast, the picketing is narrowly directed at the household, not the public. The type of picketers banned by the . . . ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt . . . ." (*Id.* at p. 486 [101 L.Ed.2d at pp. 432-433].)

Other decisions have upheld zoning laws aimed at preserving the values of seclusion and quiet repose in a residential setting. (E.g., *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 9 [39 L.Ed.2d 797, 804, 94 S.Ct. 1536].)

In short, the United States Supreme Court has described targeted picketing as highly offensive conduct which is not entitled to the same level of First Amendment protection as is more general expression of political or social views.

The ordinance here is limited to targeted picketing within 300 feet of the targeted residence, and narrowly defines targeted picketing as picketing that is focused on the home and "proceeds on a definite course or route in front of or around that particular residential dwelling." (San Jose Mun. Code, § 10.09.010, subd. (C).) This is the very activity that the *Frisby* court found "especially offensive" and inimical to residential privacy. (*Frisby* v. *Schultz, supra,* 487 U.S. at p. 486 [101 L.Ed.2d at p. 433].)

The only difference between *Frisby* and our case is that here the ordinance sets a 300-foot buffer zone whereas in *Frisby* the ban applied to picketing " 'before or about' " a residence or dwelling. (487 U.S. at p. 477 [101 L.Ed.2d at p. 427].) Given the necessary vagueness of the concept "before or about," we believe that the more precise 300-foot zone is less onerous. It leaves no doubt how to obey the law. Application of a bright line standard in this area is far preferable to a more general restriction. Picketers who respect the statutory boundary are protected, and there is less chance of discriminatory or uneven enforcement by the police.

█ In order to pass constitutional muster, an ordinance impacting First Amendment rights must be "narrowly tailored" to achieve a specific end. *Ward* v. *Rock Against Racism, supra,* 491 U.S. 781, held that a narrowly tailored regulation or injunction is not necessarily the least restrictive means of achieving the end, but rather, one which achieves a substantial governmental interest that could not be achieved as effectively without the regulation or injunction. (*Id.* at p. 799 [105 L.Ed.2d at pp. 680-681].)

Although *Madsen* has probably overruled this test as to injunctions, it remains the test applicable to ordinances. (*Madsen* v. *Women's Health Center, Inc., supra,* __ U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516]; *Frisby* v. *Schultz, supra,* 487 U.S. 474.)

A variety of cases have permitted "clear zones" in various demonstration contexts. These include an ordinance banning targeted congregating within 500 feet of a foreign embassy (*Boos* v. *Barry* (1988) 485 U.S. 312 [99 L.Ed.2d 333, 108 S.Ct. 1157]); a ban on picketing near a courthouse (*Cox* v. *Louisiana* (1965) 379 U.S. 559 [13 L.Ed.2d 487, 85 S.Ct. 476]); and many cases involving anti-abortion protests. (E.g., *Northeast Women's Center, Inc.* v. *McMonagle* (3d Cir. 1991) 939 F.2d 57, 63-64 [upholding injunction prohibiting all but 6 pickets within 500 feet of clinic]; *Kaplan* v. *Prolife Action League, supra,* 431 S.E.2d at pp. 844-847 [300-foot restriction against residential anti-abortion protesters].)

█ The ordinance here is a legislative choice opting to protect residential privacy within a 300-foot zone of the targeted home, at the expense of

targeted picketing. As we noted above, targeted picketing is a disfavored activity not entitled to a high level of First Amendment protection. Further, the ordinance leaves ample room for dissemination of anti-abortion ideas in a general way through marches, demonstrations and placards employed in residential neighborhoods and other places, provided individuals are not targeted within 300 feet of their homes. This zone compares quite favorably with the 500-foot zone in *McMonagle* or the 500-foot zone in *Boos* v. *Barry* protecting not residential privacy but the privacy of foreign diplomatic personnel in their embassy. (Note, too, that the ordinance in *Boos* v. *Barry* was content based, unlike here. See *Boos* v. *Barry, supra*, 485 U.S. at p. 321 [99 L.Ed.2d at pp. 344-345].)

■ Where ordinances are concerned, it is not the business of the court to write the statute. Review of legislative acts does not encompass quibbling over "a few feet." (See *Portland Fem. Women's H. Ctr.* v. *Advocates for Life* (9th Cir. 1988) 859 F.2d 681, 686.) A regulation of time, place and manner is not invalid " 'simply because there is some imaginable alternative that might be less burdensome on speech.' [Citation.]" (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 797 [105 L.Ed.2d at p. 679].) The test, again, is whether the regulation promotes a substantial governmental interest that would be achieved less effectively absent the restriction. (*Id.* at pp. 798-799 [105 L.Ed.2d at pp. 679-681].) "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." (*Id.* at p. 800 [105 L.Ed.2d at p. 681].) Another case, upholding a 100-foot boundary line around a polling place, has also stated that it is not the court's job to draw the line, and that it is not a question of constitutional dimension whether the boundary line of the buffer zone could be somewhat tighter. (*Burson* v. *Freeman* (1992) 504 U.S. 191, 210 [119 L.Ed.2d 5, 21, 112 S.Ct. 1846, 1857].)

■ City cites several examples of buffer zones of comparable size which have been legislated. These include a ban on picketing within 500 feet of a funeral home, church or temple where funeral services are being held (Mass. Gen. L. ch. 272, § 42A (1990)); a prohibition on picketing within 300 feet of an exit from any justice building or residence used by a judge, juror, or other participant in a legal proceeding (N.C. Gen. Stat. § 14-225.1 (1993)); a ban on labor picketing within 200 feet of a hiring area (Me. Rev. Stat. Ann. tit. 26, § 595 (West 1988)); a ban on soliciting driver training within 200 feet of a Department of Motor Vehicles office (Veh. Code, § 11110); a ban on soliciting traffic violator school instruction within 500 feet of any court (Veh. Code, § 11215); a sentence enhancement for committing certain substance abuse offenses within 1,000 feet of a public school

(Health & Saf. Code, § 11353.6); and a ban on reselling tickets within 1,000 feet of the place of entertainment (N.Y. Arts & Cult. Aff. § 25.11 (McKinney 1994)).

These statutes show that a 300-foot buffer zone contained in the ordinance before us is not an unusual or remarkably large protective space.

City also cites examples of the common use of 300-foot buffer zones in stay-away orders issued in harassment injunction lawsuits. (E.g., *Kobey* v. *Morton* (1991) 228 Cal.App.3d 1055 [278 Cal.Rptr. 530]; see also *Glenside West Corp.* v. *Exxon Co., U.S.A.* (D.N.J. 1991) 761 F.Supp. 1118.) The court in *Kobey* v. *Morton* viewed the 300-foot restriction there imposed as appropriate to preserve an individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution. (228 Cal.App.3d at p. 1059.) The ordinance here is equally appropriate to preserve those same rights.

Also, the 300-foot buffer zone is consistent with standard notice requirements set forth in local and state laws for land use decisions. For instance, both state and local law require that notice be given to all owners of real property within 300 feet of real property subject to a land-use decision. (Gov. Code, §§ 53096, subd. (a), 65091, subd. (a)(3), 66474.64; San Jose Mun. Code, §§ 13.48.120, 17.24.070, 20.08.360, 20.40.130, 20.44.070, etc.) The purpose of the 300-foot notice requirement is to ensure that property owners directly impacted by the land use decision have notice of the impending decision and an opportunity to give input. (E.g., *Concerned Citizens of Murphys* v. *Jackson* (1977) 72 Cal.App.3d 1021, 1025-1026 [140 Cal.Rptr. 531]; see also *Sundance Saloon, Inc.* v. *City of San Diego* (1989) 213 Cal.App.3d 807 [261 Cal.Rptr. 841] [upholding an ordinance permitting a cabaret to be open after 2 a.m. if it is 300 feet from any single- or multi-family residence].) Thus these ordinances and laws reflect a governmental choice of the 300-foot zone as that within which direct impact on the resident occurs. It is wholly reasonable to apply that same concept in the context of protection of residential privacy, by removing from that area of impact the targeted picketing which invades such privacy.

To succeed in their claim of facial invalidity, real parties here must show as a matter of law that the 300-foot zone is substantially broader than necessary to protect the right of residential privacy involved. There has been no such showing made. The trial court has made no such finding.

Although we do not believe that on demurrer City has any burden to show a reasonable factual basis for the ordinance, it has made such a showing.

City points out that the minimum standard lot frontage in City subdivisions is 55 feet. (San Jose Mun. Code, § 19.36.200.) Many lots have larger frontages. At most, therefore, the 300-foot buffer zone keeps pickets from coming within 5½ homes on either side of the targeted residence. City says the Legislature has reasonably chosen this buffer zone to provide a minimum degree of protection to the residents of targeted homes. But the zone does not prevent picketers from disseminating their message to the general public or even to the residents of the targeted homes, from a lawful distance.

The *Madsen* court explained that ordinances are entitled to greater deference than injunctions because they "represent a legislative choice regarding the promotion of particular societal interests." (__ U.S. at p. __ [129 L.Ed.2d at p. 607, 114 S.Ct. at p. 2524].) The societal interests promoted by the instant ordinance—residential privacy, and freedom from targeted harassment and intimidation—are evident. The trial judge struck down the ordinance only because he felt bound by *Madsen*. In that, he erred.

The trial judge believed that the language in *Madsen* permitting less rigorous scrutiny of ordinances than injunctions did not apply to the holding that the 300-foot buffer zone was too broad. He stated that strict scrutiny applies to the size of the boundary. However, we find no such language in *Madsen*. Nowhere does it say that 300 feet is always too much nor that the size of the boundary is subject to strict scrutiny. The decision carefully scrutinizes that with which it deals—an injunction—to make sure it is no broader than necessary. Then, the court considers whether something less than 300 feet would be adequate. But that is not the way to review an ordinance, and nothing in *Madsen* says that it is.

We know of no case which attempts to second-guess a legislature by initiating a judicial inquiry whether the legislature could have picked a smaller boundary zone. There is no general rule that a legislature must act as restrictively as possible. As the United States Supreme Court has said, "The 'less-restrictive-alternative analysis . . . has never been a part of the inquiry into the validity of a time, place, and manner regulation.' [Citation.] Instead, our cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.' [Citation.]" (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 797 [105 L.Ed.2d at p. 679].)

A legislature must act reasonably, and its choices are traditionally entitled to judicial deference unless they run clearly afoul of a constitutional requirement. (E.g., *Lockport* v. *Citizens for Community Action* (1977) 430

U.S. 259, 269, 272 [51 L.Ed.2d 313, 323-325, 97 S.Ct. 1047]; *N.O. Public Service* v. *New Orleans* (1930) 281 U.S. 682, 686 [74 L.Ed. 1115, 1117-1118, 50 S.Ct. 449]; *Frisby* v. *Schultz, supra*, 487 U.S. at p. 483 [101 L.Ed.2d at pp. 430-431]; *Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 613 [37 L.Ed.2d 830, 840-841, 93 S.Ct. 2908].) Thus in *Frisby*, the ordinance did not even say that it applied to targeted picketing but banned all residential picketing, yet the court construed it as applicable to targeted picketing in order to save its validity. And *Madsen*, as stated above, carefully points out that ordinances are to be construed and tested differently from injunctions. An injunction may be no broader than necessary, whereas an ordinance is valid if it reasonably supports the government purpose in such a way that anything less would do an inferior job.

 City has stated many valid concerns which have prompted its enactment of this ordinance. In analyzing a substitute ordinance which City has enacted for the duration of our review, the city attorney states that "Picketers assembled at or near to the borders of a home create virtually the same invasion of residential privacy for its occupants and instill identical feelings of captivity, fear and intimidation in the targeted residents as do picketers directly in front of the residence. If picketers are close to a residence, it becomes impossible for the residents to access or leave their homes without having to run a gauntlet and confront picketers. For this reason, as other courts have recognized, buffer zones are needed to prevent the siege upon the home and the offensive intrusions of residential privacy caused by targeted residential picketing activities." The preamble to the instant ordinance recites similar concerns; for example it recites that "picketing activity that is targeted at a particular residence or household whose occupants do not welcome such activity may harass and intimidate such occupants, is inherently and unreasonably offensive to and intrusive upon the right to privacy in the home and may cause the occupants of such home to experience great emotional distress." Further: "[S]uch unwelcome and targeted picketing activity creates a 'captive audience' situation because the occupants of a residence or household cannot readily move to another residence or household in order to avoid the unwelcome picketing activity being directed at them."

These recitals reflect the underlying legislative judgment that targeted residential picketing is a harmful phenomenon which needs to be limited. Defendants do not and cannot demonstrate that such conclusions are so unreasonable and arbitrary as to be beyond the power of the Legislature. To the contrary, these recitals are consonant not only with the philosophy expressed in many of the United States Supreme Court decisions discussed herein, but also with common sense.

The greater deference applied to ordinances in the *Madsen* opinion is not arbitrary. The checks and balances built into our political system rely on separation of powers. (See generally, e.g., *Myers* v. *United States* (1926) 272 U.S. 52, 292-293 [71 L.Ed. 160, 242-243, 47 S.Ct. 21] (dis. opn. of Brandeis, J.).) The judiciary does not have plenary powers of review over the Legislature; it is not a judicial function to write statutes. (E.g., *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 395 [71 L.Ed. 303, 313-314, 47 S.Ct. 114]; *Rittenband* v. *Cory* (1984) 159 Cal.App.3d 410, 417 [205 Cal.Rptr. 576]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604 [135 Cal.Rptr. 41, 557 P.2d 473]; *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990]; *Coffee-Rich, Inc.* v. *Fielder* (1972) 27 Cal.App.3d 792, 810 [104 Cal.Rptr. 252].) But injunctions are crafted by trial courts, and it is the job of reviewing courts to review trial courts. Accordingly, a much broader review power may appropriately come into play when scrutinizing an injunction. When it comes to a personal injunction, which is probably the most onerous relief which a trial court can give, a reviewing court does have broad powers of review to ensure that the trial court has not overstepped the proper limits of equitable relief. (E.g., *Grey* v. *Webb* (1979) 97 Cal.App.3d 232, 236-237 [158 Cal.Rptr. 595]; *Western Electroplating Co.* v. *Henness* (1959) 172 Cal.App.2d 278, 283 [341 P.2d 718]; *Schwartz* v. *Arata* (1920) 45 Cal.App. 596, 601 [188 P. 313].) But the reviewing court has no such power over a legislature. (Cf. *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137 [2 L.Ed. 60].)

Accordingly, the distinction which *Madsen* so carefully draws between review of an injunction and review of an ordinance is not a trivial or gratuitous part of the opinion; it is an appropriate and statesmanlike expression of the difference between review within the judicial branch, and beyond it. To assume that this distinction applies only to some undefined part of the ordinance other than the choice of 300 feet is incorrect.

Real parties' reliance on *Gregory* v. *Chicago* (1969) 394 U.S. 111 [22 L.Ed.2d 134, 89 S.Ct. 946], is misplaced. That case found insufficient evidence to convict of charges of disturbing the peace based on an orderly civil rights march which the police disrupted. The concurring opinion (Black, J.) pointed out that residential picketing can indeed be controlled by the city, but that in *Gregory* it had not enacted any ordinances to do so but relied on the ad hoc conclusion by the police that the particular demonstration was unlawful. (See conc. opn. of Black, J., at p. 125 [22 L.Ed.2d at p. 144].)

Further, on the subject of the government's right to limit targeted residential picketing, Justice Black should be quoted in full: "Were the authority of

government so trifling as to permit anyone with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past. Churches would be compelled to welcome into their buildings invaders who came but to scoff and jeer; streets and highways and public buildings would cease to be available for the purposes for which they were constructed and dedicated whenever demonstrators and picketers wanted to use them for their own purposes. And perhaps worse than all other changes, homes, the sacred retreat to which families repair for their privacy and their daily way of living, would have to have their doors thrown open to all who desired to convert the occupants to new views, new morals, and a new way of life. . . . But picketing and demonstrating can be regulated like other conduct of men. I believe that the homes of men, sometimes the last citadel of the tired, the weary, and the sick, can be protected by government from noisy, marching, tramping, threatening picketers and demonstrators bent on filling the minds of men, women, and children with fears of the unknown." (*Gregory* v. *Chicago*, *supra*, 394 U.S. at pp. 125-126 [22 L.Ed.2d at p. 144].)

### Conclusion

Let a peremptory writ of mandate issue, commanding respondent court to vacate its order of September 14, 1994, and to issue a new order denying the petition for writ of prohibition requested by real parties.

Cottle, P. J., and Premo, J., concurred.

A petition for a rehearing was denied March 17, 1995, and the petition of real parties in interest for review by the Supreme Court was denied May 25, 1995. Kennard, J., was of the opinion that the petition should be granted.